GULOTTA, Judge.
In this law suit for personal injuries received by plaintiff in an altercation with the assistant manager of a supermarket, the jury awarded plaintiff $4,000.00. Defendants appeal, contending the jury erred in finding that defendant Jim Couget used excessive force when he detained plaintiff Marcia Hurel in connection with her arrest for attempted theft of merchandise. They also assert the trial judge erred in refusing to charge the jury on contributory negligence and in forbidding defendants to argue contributory negligence as a defense. Finally, they maintain the award is excessive. Plaintiff answered defendants’ appeal, seeking an increase in quantum. We affirm.
This case is a classic example of a factual finding based on a credibility determina *MCDLIII tion, where the litigants offered contradictory evidence to support their differing versions of the episode.
The incident occurred on February 19, 1976, as plaintiff was shopping in the Winn-Dixie store accompanied by her two-year-old son. According to plaintiff, she was confronted by the assistant manager, Coug-et, who accused her of changing price tags on meat packages. Hurel testified that Couget cursed, abused and “punched (her) upside (her) temple,” and that he continued to punch her in the face, nose, eye and breast. She claimed Couget dragged her into the back storage room, a distance of approximately three aisles, and struck her on the back of her head, knocking her to the floor. He then pushed her into a walk-in freezer, kicked her in the face, and kept her in the freezer for ten or fifteen minutes until the arresting officers arrived. She claims that as a result of the struggle she was bleeding in the face, behind the ear and from the nose. She did not deny that it was possible she had ripped Couget’s clothes in the course of the fight; she claimed, however, she did so only in an attempt to keep Couget from hitting her. She also acknowledged that she probably struck or scratched Couget, but claimed this was done in an attempt to defend herself.
Hurel’s version of the incident was corroborated by an eye witness, who was shopping in the store when the fight started. This witness testified that Couget struck Hurel numerous times, knocked her down, dragged her into a room, and beat her. She stated that she did not see Hurel strike or hit Couget. According to this witness, both combatants were cursing, but Hurel was “hollering, ‘Don’t hit me.’ ” She did acknowledge, under cross examination, that Hurel was trying to fight back.
Hurel’s mother testified that she saw her daughter at Central Lockup, and that her face was a mess, with a swollen nose, bloody head, and eyes puffed closed. She described her daughter as shaking and nervous, and testified that she accompanied her to Charity Hospital. Hurel’s sister generally corroborated the description.
An off-duty plainclothes police officer, who came into the store shortly after the incident occurred, stated that when he talked with plaintiff she was voicing obscenities. He noticed that Couget’s clothing was dirty and disheveled, and that he had scratches on his forearm and neck. The officer did not see any scratches or bruises on Hurel, nor did he see any blood on her face, clothing or hair. He testified that he found several .22 caliber bullets and a closed five-ineh-long knife in her purse.[1]
Defendant Couget’s testimony differed from plaintiff in several important respects. He testified that when he questioned plaintiff about her changing price labels, she began to curse. Her child began running down one of the store aisles, and she pushed Couget as she attempted to go after the little boy. Couget pursued Hurel and grabbed her arm, whereupon she began swinging at him and hitting him with her purse. She kicked him and they both fell to the ground, as she continued punching, kicking him and constantly screaming. Couget testified further, “I tried my best to get my arms around her to hold her, to get her to the back cooler, because I didn’t know any place else to hold her, she just wouldn’t let me hold her, she just kept trying to get away. All I could do is hang onto her.”
He denied that he had dragged her while she was on the floor, but did admit he dragged her while she was in a standing position. He admitted that in attempting to restrain her, he had punched her, although he claimed he struck her only hard enough to let her know that she had to stop fighting. He testified that he put plaintiff in the cooler to detain her until the arrest *MCDLIV ing officers arrived. He had rips in his pants and shirts; several buttons had been torn from his shirt, which was hanging open, and his arms and neck had been scratched. He testified that Hurel had a trickle of blood coming from her nose.
Several Winn-Dixie employees corroborated Couget’s version of the altercation. Lorraine Langlois witnessed the entire incident. She testified she saw Hurel changing price tags on meat, and when she called this to Hurel’s attention, Hurel called her “dirty names.” She also said she did not see Couget punch Hurel, but rather that Hurel “swung first . . . .” Langlois testified that she did not see any marks on plaintiff’s face.
Three other Winn-Dixie employees testified, and generally confirmed Couget’s version. One of them described Couget as trying to restrain Hurel, and also as trying to stop her from “riding piggyback on him.” One of these employees said that blows were being exchanged by both parties in the scuffle, although he did not see Couget punch Hurel, but only that she was fighting back.
Defendants attempted to discredit the eyewitness shopper, Delores Adams, who testified on plaintiff’s behalf. Defendants’ thesis was that this witness, who was standing at the check-out counter, could not have seen the entire fight, which began in the front of the store and continued through and into the rear, ending at the walk-in cooler. Defendants offered the testimony of Winn-Dixie’s maintenance superintendent regarding the physical layout of the store, and in connection therewith introduced into evidence a diagram of the arrangement of the check-out counters, shopping aisles and the cooler in relation to each other. The jury retired to the store to view the scene. Obviously, however, the jury still found Adams’ corroboration of plaintiff’s version credible.
At the close of evidence, the jury was instructed on Code of Criminal Procedure article 215, which provides:
“A. A peace officer, merchant, or a specifically authorized employee of a merchant, may use reasonable force to detain a person for questioning on the merchant’s premises, for a length of time not to exceed 60 minutes, when he has reasonable cause to believe that the person has committed a theft of goods held for sale by the merchant, regardless of the actual value of the goods. The detention shall not constitute an arrest. * * * ”
(Emphasis added.)
In answer to interrogatories, the jury found that Couget did have reasonable cause to detain Hurel, but that he used excessive force in detaining her. The testimony in this case is contradictory insofar as the amount of force Couget used. It is clear that the jury, based on a credibility determination, accepted plaintiff’s version of the incident and rejected defendant’s version. Under the circumstances, we cannot say the jury manifestly erred.
Defendants claim the trial judge erred in failing to charge the jury on contributory negligence and in refusing to allow defendants to argue this defense. Defendants assert that the jury was deprived of hearing arguments that might assist in determining whether Couget’s actions were negligent or intentional. Absent a charge on contributory negligence, defendants contend, the jury had to conclude that Couget’s actions were intentional. Defendants claim further the evidence does not support any intention on Couget’s part to injure Hurel, but only an attempt to restrain her.
We find no merit to this argument. Even if we assume that Hurel’s actions contributed to the need of force by Couget to detain her, the ultimate question for the fact finder was whether that force was excessive and therefore not reasonable. A charge on contributory negligence is not relevant to the question of the use of excessive force. Such a charge would do nothing more than confuse the jury, and distract them from the required ultimate factual *MCDLV determination. Moreover, we believe this case may best be analogized to the various assault and battery cases holding that even where there is an aggressive act, justifying a battery, the person retaliating may use only such force as is necessary to repel the aggressor. See, e. g., Tripoli v. Gurry, 253 La. 473, 218 So.2d 563 (1969); Kyle v. City of New Orleans, 353 So.2d 969 (La.1977); Porche v. Fernandez, 286 So.2d 418 (La.App. 4th Cir. 1973). The questions here were whether Couget was justified in detaining Hurel, and whether he used excessive force in detaining her. The trial judge was correct in refusing to charge the jury on contributory negligence.
Regarding quantum, we do not find that the jury abused its discretion. Hurel was seen in Charity Hospital’s accident room and had x-rays taken on the day of the fight. A notation on her outpatient chart dated February 20, 1976 indicated no evidence of fracture, but stated there were “a lot of contusions.” Other notations on the chart are illegible except that apparently plaintiff was advised to return in five days. Her chart indicates no return hospital visits until August 1977. At that time she complained of headaches, dizziness and blacking out. Neurological findings then seemed to have been negative, but because of continued complaints she saw Dr. Joseph Epps, Jr. on February 24, 1978. Dr. Epps’ examination revealed a healed laceration above the right eye, decreased subjective hearing in the right ear, and decreased sensation in the left lower ear, and there was tenderness to palpation in the back of her head. He referred her to Dr. George S. Walker regarding a hearing loss and nosebleed.
Dr. Walker’s report of a March 9, 1978 visit shows her complaints were of recurrent nosebleed and difficulty with hearing, as well as ear pain. Dr. Walker, stating that plaintiff gave a history of having received numerous blows about the head and neck, explained in his report that ear pain is common in persons who have experienced trauma to the jaw. He considered the pain to be a possible result of Hurel’s history of trauma. He found a deviated nasal septum on the left side, which he stated could possibly be of traumatic origin. He concluded that her hearing loss was not out of range of normal limits. His impression was nosebleed secondary to the septal deviation, especially on the left nostril, and dysfunction of the joint of the jaw in the area of the temple, resulting in pain.
On October 10, 1978 plaintiff was seen by Dr. Richard W. Levy, who testified that she may have had a mild concussion due to the altercation. He stated that concussions of this type may last anywhere from several weeks to several months, and presumably are expected to subside thereafter. He could not explain why, after two and one-half years, Hurel continued to complain of headaches, dizziness, memory loss and blurring vision. Dr. Levy did not assign the complaints directly to the mild concussion, and indicated further that anxiety, tension, and frustration cause these types of headaches.
Considering the injuries Hurel sustained, the anxiety and mental anguish resulting from her detention at the store, the continued episodes of headaches, dizziness and nosebleeds, and her proven medical expenses in the amount of $194.50, we cannot say the $4,000.00 award was either excessive or inadequate.
Having so concluded, we affirm the judgment of the district court.

AFFIRMED.

BEER, J., dissents in part.

. According to the testimony of another police officer, because the knife was not a switchblade, it was not unlawful to carry it.